IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| VOICESTREAM PCS II CORP. d/b/a T-MOBILE, et. al., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 05-04037-CV-C-NKL ) |
| BPS TELEPHONE CO., et al., | ) ) |
| Defendant. | ) |

**ORDER**

Pending before the Court is a Motion to Dismiss filed by Defendants BPS Telephone Co., et al. (collectively "Defendants"). The Motion is granted because this Court lacks subject matter jurisdiction to review an order of the Federal Communications Commission ("FCC").

**I.     Background and Procedural History**

This dispute is between the Defendants, which are several rural, land line telephone providers located in Missouri, and T-Mobile, a national wireless telephone provider. T-Mobile objects to paying these Defendants termination fees for calls which originate on T-Mobile's network but are terminated on the Defendants' network. Typically, when a T-Mobile customer places a call to one of the Defendants' customers, the call is routed from the T-Mobile network through a large interexchange and terminated on the Defendants' network. T-Mobile's subscribers pay T-Mobile to place

1

the call, and T-Mobile pays a fee to the interexchange provider for routing the call, but Defendants, who operate the local exchanges, receive no compensation for completing the call. Similarly, if a call is placed by Defendants' customers to a T-Mobile subscriber, the call is terminated by T-Mobile and T-Mobile receives no compensation for completing that call.

For years, T-Mobile has taken the position that it does not owe the Defendants any compensation for terminating these calls. T-Mobile has argued that because the Defendants are not paying any compensation to T-Mobile when T-Mobile terminates the Defendants' calls, T-Mobile should not pay Defendants for terminating T-Mobile's calls. T-Mobile also claims that any attempt by the PSC to impose a termination tariff on it for these terminated calls is in violation of the Telecommunications Act of 1996.

Under the Telecommunications Act of 1996, telephone networks, including wireless networks, may enter into an agreement with incumbent local exchange carriers ("ILEC"), such as the Defendants, for mutual compensation of terminated calls.[1] By law, the ILECs must negotiate in good faith with wireless carriers to reach such agreements. *See* 47 U.S.C. 252, 253 (2000). Until recently, however, local exchange carriers did not have the ability to force a wireless carrier into the negotiation process.[2] Hence, if a

---

[1] See *Iowa Network Services, Inc. v. Qwest Corp.*, 363 F.3d 683 (8t Cir. 2004), for discussion of this process.

[2] In a decision made on or about February 17, 2005, the FCC made prospective changes to its rules. Local exchange carriers are now permitted to initiate negotiations with wireless carriers for mutual compensation agreements. *In the matter of Developing a Unified Intercarrier Compensation Regime*, 20 F.C.C.R. 4855 ¶ 9 (2005).

2

Case 2:05-cv-04037-NKL   Document 30   Filed 08/24/05   Page 2 of 12

wireless provider did not seek an agreement for mutual compensation of terminated calls, it could, by its calculated inaction, prevent the LEC from getting contractual compensation. In this case, T-Mobile did not seek a contract with the Defendants for mutual compensation of the terminated calls. Instead, T-Mobile just sent its calls through to Defendants' customers.

In response, the Defendants filed with the Missouri Public Service Commission ("PSC") a request for a wireless termination service tariff against T-Mobile and other wireless companies. This tariff would permit Defendants to charge for calls terminated on the Defendants' network under certain circumstances.[3] The tariff operates to compensate Defendants only in the absence of a mutually agreed upon compensation agreement. The tariff is inapplicable if an agreement has been reached pursuant to the mechanism created by the Telecommunications Act of 1996. In February 2001, the PSC approved this tariff. The tariff's implementation and enforcement have been the subject of multiple proceedings across several jurisdictions.

### A. Missouri Court of Appeals

First, all of Missouri's wireless providers, except T-Mobile, challenged the implementation of the tariff with the PSC and lost. Even though T-Mobile did not participate in the hearing before the PSC to challenge the tariff, T-Mobile had a right

---

[3]Charges only apply to "local calls," which are defined as wireless calls that originate in a major trading area ("MTA") that corresponds to the geographic area where the local telephone carrier operates. A call that originates from an MTA that does not correspond with a local telephone carrier's region is considered a "toll call" and a different system of compensation exists.

3

under Missouri law to seek a rehearing with the PSC and to appeal the PSC's Order to a Missouri state court. T-Mobile sought neither a rehearing nor did it appeal the PSC's decision. The other wireless providers, however, did take an appeal. The Missouri Court of Appeals, in *State ex rel. Sprint Spectrum L.P. v. Mo. Pub. Serv. Comm'n*, 112 S.W.3d 20 (Mo. Ct. App. 2003), eventually upheld the PSC's tariff, and specifically held that the termination tariff was not preempted by the Telecommunications Act of 1996. The Court of Appeals held:

> We disagree that federal laws preempted the Commission's authority to approve tariffs in the instant case. The Commission determined that the Act's "reciprocal compensation arrangements" were inapplicable because no agreements were ever entered into by the wireless companies and rural carriers. The Act requires "local exchange carriers"–such as the rural carriers–to negotiate in good faith and establish compensation arrangements for the termination of traffic, but it does not impose the same obligation on wireless carriers. . . . The Act does not provide a procedure by which wireless companies can be compelled to initiate or negotiate compensation arrangements with local exchange carriers. In the absence of a comprehensive scheme to address the wireless companies' conduct, the Commission did not use its tariff-approval authority to supplant federal law.

*Sprint*, 112 S.W.3d at 25. The Court of Appeals also held that there was no conflict between federal law and the PSC's tariff, stating:

> The tariffs approved by the Commission expressly state that they are subordinate to any negotiated agreements under the Act. Thus, the Commission's action does not prevent the negotiation of reciprocal compensation arrangements or otherwise conflict with the Act's procedural requirements. . . . The wireless companies have failed to follow prior Commission orders to establish agreements with the rural carriers before sending wireless calls to their exchanges. The rural carriers have a constitutional right to a fair and reasonable return upon their investment. The Commission cannot allow the wireless calls to continue terminating for free because this is potentially confiscatory. The tariffs reasonably show a

4

> void in the law where the wireless companies routinely circumvent payment to the rural carriers by calculated inaction. The tariffs provide a reasonable and lawful means to secure compensation for the rural carriers in the absence of negotiated agreements.

*Sprint*, 112 S.W.3d at 25-26 (citations omitted).

**B. FCC**

While the *Sprint* case was pending before the Missouri Court of Appeals, T-Mobile sought relief, not from the Missouri courts, but instead from the FCC. T-Mobile asked the FCC to declare that state termination tariffs were in conflict with federal law because they (1) bypass negotiation and arbitration procedures established in section 251 and 252 of the Act; (2) do not provide for reciprocal compensation to wireless telephone providers; and (3) contain rates that do not comport with the Total Element Long-Run Incremental Cost (TELRIC) pricing methodology as required by the Commission's rules.

*In the Matter of Developing a Unified Intercarrier Compensation Regime*, 20 F.C.C.R. 4855, ¶ 1 (2005), the FCC denied T-Mobile's request for declaratory judgment and instead held that state termination tariffs are not unlawful per se. *Id.* at ¶10. The FCC also held that LEC's were prospectively permitted to initiate mutual compensation agreements with the wireless companies just as wireless companies could compel the LECs to negotiate mutual compensation agreements with them. However, the FCC stated that "[b]ecause the existing rules do not explicitly preclude tariffed compensation arrangements, we find that incumbent LECs were not prohibited from filing state termination tariffs and *[wireless] providers were obligated to accept the terms of*

*applicable state tariffs.*" *In the Matter of Developing a Unified Intercarrier Compensation Regime*, 20 F.C.C.R. 4855 ¶ 9 (emphasis added). The FCC explained that:

> Our finding that tariffed arrangements were permitted under the existing rules is based on the fact that neither the Commission's reciprocal compensation rules, nor the section 20.11 mutual compensation rules adopted prior to the 1996 Act, specify the types of arrangements that trigger a compensation obligation. Because the existing compensation rules are silent as to the type of arrangement necessary to trigger payment obligations, we find that it would not have been unlawful for incumbent LECs to assess transport and termination charges based upon a state tariff.

*Id.* at ¶ 10. The FCC went on to conclude that "[b]y routing traffic to LECs in the absence of a request to establish reciprocal or mutual compensation, *[wireless] providers accept the terms of otherwise applicable state tariffs.*" *Id.* at ¶ 12 (emphasis added).

### C.     PSC

Subsequent to the Missouri Court of Appeals' ruling and the ruling by the FCC, the Defendants sought to enforce the PSC's tariffs against T-Mobile by filing a complaint with the PSC. The PSC sustained the Defendants' complaint on January 27, 2005. *BPS Telephone Co. v. Voicestream Wireless Corp.*, 2005 WL 927421 (Mo. P.S.C. 2005). The PSC specifically found that T-Mobile did not have an interconnection agreement in effect with any of the Defendants and that T-Mobile did send wireless calls to each of the Defendants' networks. *Id.* at 29. Under Missouri law, T-Mobile had a right to appeal the decision of the PSC within thirty days. Mo. Rev. Stat. § 386.510 (2000). T-Mobile did not pursue an appeal; instead, T-Mobile brought this case in federal court, seeking to enjoin the Defendants from enforcing the PSC's termination tariffs and seeking a

6

declaration that the tariff is unlawful.

**II.     Discussion**

    **A.     Introduction**

Defendants' Motion to Dismiss is filed under Rule 12 of the Federal Rules of Civil Procedure.  Defendants first seek dismissal because T-Mobile's claims are barred by *res judicata* and the Rooker-Feldman doctrine.  Second, they argue that 47 U.S.C. § 207 precludes T-Mobile from seeking relief before both the FCC and the United States District Court.  Third, Defendants argue that the Court does not have jurisdiction to hear this complaint, because T-Mobile has not availed itself of the required dispute resolution provisions contained in the Telecommunications Act of 1996.  Fourth, they argue that the complaint should be dismissed for failure to state a claim upon which relief can be granted.  Fifth, Defendants argue that the complaint should be dismissed for lack of subject matter jurisdiction because the complaint seeks to revive issues decided by the FCC, and under 28 U.S.C. § 2342 ("the Hobbs Act") and 47 U.S.C. § 402 of the Telecommunications Act, only the United States Court of Appeals has jurisdiction to do that.

    **B.     Application of the "Hobbs Act" and 47 U.S.C. § 402 of the Telecommunications Act**

Section 402 of the Telecommunications Act of 1996 directs all appeals from an FCC decision to the United States Court of Appeals.  *See* 47 U.S.C. 402(a).  Furthermore, the Hobbs Act states that "[t]he Court of Appeals . . . has exclusive jurisdiction to enjoin,

7

Case 2:05-cv-04037-NKL     Document 30     Filed 08/24/05     Page 7 of 12

set aside, suspend (in whole or in part), or to determine the validity of all final orders of the Federal Communications Commission made reviewable by section 402(a) as title 47 . . . ." 28 U.S.C. § 2342 (2000). These two provisions establish the exclusive jurisdiction of the courts of appeal to review FCC orders. *Wilson v. A.H. Belo Corp.*, 87 F.3d 393, 396-97 (9th Cir. 1996). The Eighth Circuit states that: "'[t]he district court must dismiss a complaint if it directly attacks an FCC order or if it raises only issues that were conclusively decided by the FCC order.'" *Rural Iowa Independent Telephone Ass'n v. Iowa Utilities Bd.*, 362 F.3d 1027, 1030 (8th Cir. 2004) (quoting *Pacific Bell v. Pac West Telecomm, Inc.*, 325 F.3d 1114, 1125 (9th Cir. 2003).

T-Mobile does not dispute the finality of the FCC's orders, and it is clear that the FCC's order is final. T-Mobile does argue, however, that the FCC did not conclusively decide all the issues which T-Mobile now raises in its complaint for declaratory relief before this Court. T-Mobile points to the following language in the FCC order to show that the FCC did not determine that the PSC's termination tariff was lawful or that T-Mobile owed the tariff to these Defendants. "We make no findings regarding specific obligations of any customer of any carrier to pay any tariff charges." *In the Matter of Developing a Unified Intercarrier Compensation Regime*, 20 F.C.C.R. 4855, ¶ 10 n. 40. While the FCC did not determine that a specific payment was owed by T-Mobile to the Defendants, it did conclusively decide the very issues which T-Mobile now raises with this Court to support its claim for declaratory relief.

In the case pending before this Court, T-Mobile raises five counts for relief. T-

Mobile claims that Counts V and VI of its complaint were not conclusively decided by the FCC, apparently conceding that Counts I through IV were conclusively decided by the FCC. Having reviewed the FCC decision and Counts I through IV of T-Mobile's complaint in this case, the Court finds that those issues were conclusively decided by the FCC order. Therefore, the Court will only address specifically T-Mobile's assertions concerning Counts V and VI of its complaint.

T-Mobile argues that the FCC order does not addresses Count V–which alleges that the PSC termination tariffs violate section 251(b)(5) of the Telecommunications Act. 47 U.S.C. 251(b)(5). Those sections require local telephone carriers to "establish reciprocal compensation arrangements for the transport and termination of telecommunications." *Id.* In other words, T-Mobile continues to assert, as it has done in the past, that the PSC's termination tariff is not enforceable because the Telecommunications Act of 1996 requires these disputes to be resolved by a negotiated agreement, not a state order. But this assertion is clearly inconsistent with the FCC's order. 20 F.C.C.R. 4855, ¶ 12. Even though the FCC in a footnote stated that "[b]ecause most wireless termination tariffs are effective only in the absence of reciprocal compensation arrangements under section 251(b)(5), we need not decide whether such tariffs satisfy the statutory requirements of that section." 20 F.C.C.R. 4855, ¶ 12 n. 49, the FCC, made it clear that in the absence of a request by T-Mobile for a reciprocal compensation arrangement under section 251(b)(5), an LEC can collect state imposed termination tariffs when a wireless telephone company sends traffic to the LECs. The

9

wireless companies, by sending their calls to the LECs, "accept the [alternative] terms of the otherwise applicable state tariffs." *Id.* at 12. Under such circumstances, it is unnecessary to determine whether the tariff complies with section 251(b)(5), because there is no agreement to be evaluated. There is no agreement to be evaluated because T-Mobile did not request an agreement, the event which triggers the requirements of section 251(b)(5).

     T-Mobile also argues that the FCC failed to address Count VI which alleges that the state imposed termination tariffs do not comply with the federal pricing rates set out in section 252(d)(2). T-Mobile, however, clearly raised this issue in the FCC action as evidenced by the first paragraph of the FCC's ruling which in pertinent part states: "[P]etitioners maintain that these tariffs are unlawful because they . . . contain rates that do not comport with the total Element Long-Run Incremental Cost (TELRIC) pricing methodology as required by the Commission's rules." 20 F.C.C.R. 4855, ¶ 1. Later, the FCC clearly implies that the rates are inapplicable in the absence of negotiated arrangement when they stated that "[t]hese tariffs do not prevent [wireless telephone] providers from requesting reciprocal or mutual compensation at the rates required by the [Telecommunications Act of 1996]." 20 F.C.C.R. 4855, ¶ 12. In other words, T-Mobile had the ability to get a negotiated termination agreement that complied with the terms of the Telecommunications Act of 1996 merely by asking for it. However, T-Mobile chose not to request an agreement, and is therefore not entitled to a tariff based on the TELRIC formula.

10

T-Mobile also argues that they have a "*de facto* bill-and-keep arrangement" with the Defendants and that arrangement is effectively a negotiated agreement as contemplated by section 251 of the Act and, therefore, the PSC tariff is unenforceable because it is in conflict with federal law. T-Mobile is defeated by its own language. The term *de facto* means to "have[] effect even though not formally or legally recognized." BLACK'S LAW DICTIONARY 375 (5th Ed. 1979). A *de facto* arrangement is therefore one that operates as if it had been agreed upon, but when in fact no formal agreement was ever reached by the parties. By definition, a *de facto* mutual compensation arrangement could not be reached as a result of mutual negotiations, and the FCC states that "in the absence of a request [by T-Mobile] to establish reciprocal or mutual compensation, [T-Mobile] accept[s] the terms of otherwise applicable state tariffs." 20 F.C.C.R. 4855, ¶ 12. Thus, even assuming that a *de facto* arrangement exists, under the FCC's conclusive findings, it does not invalidate the termination tariff. The FCC's order clearly establishes that termination tariffs are lawful in the absence of an actual, negotiated agreement, not a *de facto* arrangement that exists solely because T-Mobile sends it's calls through to the LECs and the Defendants send their calls through to T-Mobile. Again, the FCC states that by sending the calls to the LECs, T-Mobile "accept[s] the [alternative] terms of otherwise applicable state tariffs." *Id.*

Because the FCC has already decided that in the absence of an actual agreement, termination tariffs do not conflict with the provisions of the Telecommunications Act, the motion to dismiss must be granted. To find in favor of T-Mobile on the claims raised in

11

its complaint would be in conflict with the FCC's order. This would be in violation of the Hobbs Act and section 402 of the Telecommunication Act of 1996, because any dissatisfaction that T-Mobile had with the FCC decision had to be raised before the Court of Appeals, not this Court.

### C. *Res Judicata*

The Defendants have also argued that T-Mobile's complaint is barred by *res judicata*. One would think that the doctrines of issue preclusion and claim preclusion would bar T-Mobile's current complaint given that this is the fourth adjudicatory entity in which T-Mobile's issues have either been raised or could have been raised. However, because it is clear that the FCC has resolved all the issues raised in T-Mobile's complaint, it is unnecessary to resolve the complicated *res judicata* rules which are applicable in the context of telecommunication law.

## III. Conclusion

Accordingly, it is hereby

(1) ORDERED that Defendants' Motion to Dismiss is GRANTED as to all Counts of T-Mobile's Petition.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

DATE: August 24, 2005
Jefferson City, Missouri